IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CLERK'S COPY

ROBERT TAYLOR, an individual,
and MESA CASTING, a New
Mexico company,

        Plaintiffs,

      vs.

INTERSTATE NUCLEAR
SERVICES, INC., a subsidiary of
Unifirst Corp.,

        Defendant.

No. CIV 98-1249 MV/RLP

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss, filed November 19, 1998 **[Doc. 5]**. The Court, having considered the motion, response, reply, relevant law, and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED IN PART**, as explained below.

## BACKGROUND

Plaintiffs Robert Taylor (Taylor) and his company Mesa Casting bring suit against Defendant Interstate Nuclear Services, Inc. ("Interstate Nuclear"), alleging 14 common law torts. For the purpose of resolving this Motion, the Court assumes the truth of the following facts as pled in the Complaint:

18

Interstate Nuclear is a "national nuclear laundry service," meaning that the company processes radiation-contaminated clothing. Interstate Nuclear operates a facility at 1310 Siler Road in Santa Fe, New Mexico. This facility receives and process contaminated clothing from Los Alamos Laboratories, and possibly other sites.

From 1990 to 1996, Taylor and his company Mesa Casting leased property from Interstate Nuclear at 1310 Siler Road No. 2. The Complaint does not specify what type of company Mesa Casting is but states that business was located directly adjacent to the Interstate Nuclear facility. Accordingly to the Complaint, during the course of his tenancy, Taylor was exposed to "radioactive and/or hazardous emissions" from the Interstate Nuclear facility. The Complaint further states that Interstate Nuclear failed to warn Taylor of the potential health dangers of this exposure. As a result of his exposure, Taylor asserts that he was forced to vacate the premises, causing harm to his business, and asserts that he has sustained personal injuries, including increased risk of disease and substantial emotional distress.

Plaintiffs assert the following causes of action: negligence, negligence per se, failure to disclose dangerous condition, breach of warranty of habitability, abnormally dangerous activity, nuisance, assault and battery, trespass, intentional and negligent infliction of emotional distress, failure to warn, misrepresentation, fraud, increased risk of disease/ fear of disease, and interference with business relationship.

Defendant moves to dismiss Plaintiffs' common law causes of action on the grounds that the Price-Anderson Act, 42 U.S.C. § 2210, preempts these claims. Defendant asks that the current Complaint be deemed as raising a single cause of action under the Price-Anderson Act. Plaintiffs resist, arguing that the Price-Anderson Act does not apply.

## STANDARD OF REVIEW

A court may not dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts supporting his or her claim that would entitle him or her to relief. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his or her claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that [he or she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). "[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).

## ANALYSIS

Defendant moves to dismiss Plaintiffs' common law causes of action on the grounds that the Price-Anderson Act preempts these claims. Defendant asks that the current Complaint be deemed

as raising a single "public liability action" under the Price-Anderson Act, which, it argues in its Reply Brief, consists solely of the following two elements: (1) exposure to radioactive material in excess of federally established regulations; and (2) actual injury caused by that exposure. Further, Defendant argues that even if the other elements of Plaintiffs' state law claims are not preempted, the standard of care applicable to such claims must be derived from federal law. Plaintiffs resist, arguing that the Price-Anderson Act does not apply to the events at issue here or, in the alternative, that the Act only preempts those state law causes of action which actually conflict with federal law.

The Court concludes that the Price-Anderson Act does apply to the events alleged here and that the Act does preempt all state law causes of action. However, the Court also finds that the state law causes of action form the elements of the public liability action under the Price-Anderson Act, and that the relevant standard of care in this case is defined by the New Mexico regulations, not the federal regulations, to the extent that New Mexico law does not actually conflict with federal regulation of nuclear safety. To the extent that there is an actual conflict between New Mexico and federal law, federal law controls the standard of care and the scope of the duties owed by Defendant to Plaintiffs.

A.     Regulation of Nuclear Material and Jurisdiction Over Nuclear Torts

In order to determine whether federal law preempts Plaintiffs' claims and to what extent, it is unfortunately necessary to review the history and current status of federal and state regulation of nuclear materials and the division of jurisdiction over nuclear related torts in some detail.

1. **The Atomic Energy Act and the Price-Anderson Act**

The Tenth Circuit Court of Appeals recently summarized the history of federal regulation

of nuclear materials and jurisdiction over nuclear torts as follows:

> The Atomic Energy Act (AEA) was created in 1954 to facilitate a transition from a federal government monopoly over the production and use of atomic materials to a regime in which private industry also would have a role in their production and use. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 206-07, 103 S.Ct. 1713, 1723-24, 75 L.Ed.2d 752 (1983). Limiting the states' role in regulating atomic energy, Congress granted a federal agency, the Atomic Energy Commission (later the Nuclear Regulatory Commission), "exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession, and use of nuclear materials." *Id.* at 207, 103 S.Ct. at 1724. Hazards arising from atomic radiation were made a particularly federal concern, as to which the states had no authority to regulate. *Id.* at 209-10, 103 S.Ct. at 1725. Accordingly, with very few exceptions, state attempts to regulate in this area are preempted.
>
> In 1957, Congress amended the AEA through the Price-Anderson Act (PAA), creating specific protections from tort liability for the nuclear industry. *See Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984). The PAA contains three distinct elements: (1) an aggregate ceiling on the liability for nuclear tort claims; (2) a "channeling of liability" to protect private entities from liability for their indirect participation in atomic development; and (3) an indemnification program, through which the federal government would require private insurance coverage to a certain level, and pay public liability claims above that amount, up to the liability ceiling created by the PAA. *In re TMI Litig. Cases Consol. II ("TMI II"),* 940 F.2d 832, 852 (3d Cir.1991). . . . Congress initially chose not to create a specific federal cause of action for nuclear torts; rather, the legislative history suggests that Congress was content to allow liability to be dictated by existing [state] causes of action. *Silkwood,* 464 U.S. at 252-55, 104 S.Ct. at 623-25 (finding state punitive damages statute not preempted by the PAA).

*Kerr-McGee Corp. v. Farley,* 115 F.3d 1498, 1503 (10th Cir. 1997), *cert. denied* 118 S.Ct. 880, 139

L.Ed.2d 868 (1998) *see also Lujan v. Regents of the University of California,* 69 F.3d 1511, 1514

(10th Cir. 1995). As another Tenth Circuit panel recently summarized,

> [t]he original Price-Anderson Act assured adequate compensation for the victims of nuclear accidents by authorizing the federal government to indemnify its licensees and contractors for any liability they might incur as a result of their activities, thus

increasing the funds that might otherwise be available for compensating victims. . . . However, absent an independent basis for federal jurisdiction, any action against a licensee or contractor had to be brought in state court and was governed by state substantive and procedural law.

*Lujan*, 69 F.3d at 1514.

In 1966, Congress amended the statute again, for the first time providing original jurisdiction and removal jurisdiction to federal courts for claims arising from "extraordinary nuclear occurrences." *Lujan*, 69 F.3d at 1514. An "extraordinary nuclear occurrence" ("ENO") is defined by the statute as "any event causing a discharge or dispersal of source, special nuclear, or by product material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite." 42 U.S.C. § 2014(j); *Lujan*, 69 F.3d at 1515 n. 2. Jurisdiction for nuclear tort claims which did not result from an extraordinary nuclear occurrence remained with the state courts. *See Kiick v. Metropolitan Edison Co.*, 784 F.2d 490 (3d Cir.1986). As a result, in 1986 the Third Circuit Court of Appeals held that tort claims arising from the Three Mile Island nuclear incident had to be brought in state court rather than federal court as this incident had not been declared an ENO. *Id.*

### 2. The 1988 Amendments

In response to the Third Circuit opinion in *Kiick*, Congress amended the PAA in 1988, substantially re-shaping the legal landscape of tort liability for injuries arising for nuclear material. The Price Anderson Amendments Act of 1988, Pub.L. No. 100-408, 102 Stat. 1066 (1988) ("1988 Amendments") "arose out of congressional understanding that the Price-Anderson system 'provides

6

persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law. It also provides a mechanism whereby the federal government can continue to encourage private sector participation in the beneficial uses of nuclear materials.'" *Farley*, 115 F.3d at 1503 (quoting S.Rep. No. 100-218, at 4 (1988)).

The 1988 Amendments expand federal jurisdiction to all claims arising out of a "nuclear incident," as follows:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the Commission, or the Secretary, as appropriate, any such action pending in any State court (including any such action pending [on the date of the 1988 Amendments] ) or United States district court shall be removed or transferred to the United States district court having venue under this subsection.

42 U.S.C. § 2210(n)(2); *see Farley*, 115 F.3d at 1503; *Lujan*, 69 F.3d at 1515. A "public liability action" is defined as "any suit asserting public liability." 42 U.S.C. § 2014(hh); *see Farley*, 115 F.3d at 1504; *Lujan*, 69 F.3d at 1515. "Public liability" encompasses any legal liability from a "nuclear incident." 42 U.S.C. § 2014(w); *see Farley*, 115 F.3d at 1504. A "nuclear incident" is defined as "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q); *see Farley*, 115 F.3d at 1504; *Lujan*, 69 F.3d at 1515.[1] Further, the statute as amended also provides

---

[1]"Byproduct material" is defined as "(1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of

that a public liability action "shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such [an] action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh); *Lujan*, 69 F.3d at 1515-16.

The effect of the 1988 Amendments and the provisions quoted above on Plaintiffs' claims is the issue currently before the Court. However, before addressing this question directly, the Court must consider the scope of state involvement in the regulation of nuclear materials.

### 3.    State Regulation of Nuclear Materials

Although Congress has reserved for the federal government all authority over the licencing and regulation of nuclear power plants, nuclear weapon production, and the control of large quantities of nuclear material, Congress has granted the states substantial regulatory authority in regards to smaller quantities of nuclear matter. In 1959, Congress amended the AEA, adding 42 U.S.C. § 2021, entitled "Cooperation with States." The purpose of this section is, among other things:

---

producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S.C. § 2014 (e). "Source material" is defined as "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials . . . ." *Id.* (z). "Special nuclear material" is defined as "(1) plutonium, uranium  enriched in the isotope 233 or in the isotope 235, and any other material which the Commission, pursuant to the provisions of section 2071 of this title, determines to be special nuclear material, but does not include source material; or (2) any material artificially enriched by any of the foregoing, but does not include source material." *Id.* (aa).

> (1) to recognize the interests of the States in the peaceful uses of atomic energy, and to clarify the respective responsibilities under this chapter of the States and the [Nuclear Regulatory] Commission with respect to the regulation of byproduct, source, and special nuclear materials; . . . [and]
>
> (4) to establish procedures and criteria for discontinuance of certain of the Commission's regulatory responsibilities with respect to byproduct, source, and special nuclear materials, and the assumption thereof by the States . . . .

42 U.S.C. § 2021(a) ("Purpose"). Under the statute, the Nuclear Regulatory Commission may enter an agreement with a state allowing the state to assume responsibility for the regulation of byproduct, source, and special nuclear materials which are present in comparatively small amounts. 42 U.S.C. § 2021 (b)-(d). Further, "[t]he Commission is authorized and directed to cooperate with the States in the formulation of standards for protection against hazards of radiation to assure that State and Commission programs for protection against hazards of radiation will be coordinated and compatible." 42 U.S.C. § 2021 (g). In certain circumstances, the states are also authorized by the statute to adopt standards or requirements more stringent than those issued by the Commission. *See* 42 U.S.C. § 2021 (o) (allowing more stringent state standards for regulation of byproduct material).

A state which has entered into an agreement with the Commission and assumed some regulatory authority for nuclear materials is known as an "Agreement State." According to the Code of Federal Regulations,

> any person in an Agreement State who manufactures, produces, receives, possesses, uses, or transfers byproduct material, source material, or special nuclear material in quantities not sufficient to form a critical mass is exempt from the requirements for a license contained in . . . the [Atomic Energy] Act . . . and from regulations of the [Nuclear Regulatory] Commission applicable to licensees.

10 C.F.R. §150.10. New Mexico is an Agreement State and the Defendant in this case handles nuclear materials in an amount not sufficient to form a critical mass. Thus, Defendant is subject to regulation by the State of New Mexico, not the federal government.

These regulations begin with the State Radiation Protection Act, N.M.S.A. 74-3-1 to 74-3-16. The Act authorizes New Mexico to become an Agreement State, establishes certain procedures for the creation and enforcement of related regulations, and places limitations on the possession of radioactive materials. *See also* Radioactive and Hazardous Materials Act, N.M.S.A. 74-4A-1 to 74-4A-14 (regarding transportation and disposal of radioactive waste). In particular, section 74-3-9 of the Act states that,

> It is unlawful for any person to possess, use, store, dispose of, manufacture, process, repair or alter any radioactive material unless he holds:
>
> (1) a license issued by the nuclear regulatory commission, and notification by the licensee to the agency of license identification;
>
> (2) a license issued by an agreement state and notification by the licensee to the agency of license identification; or
>
> (3) a license issued by the [state environmental control] agency.

N.M.S.A. 74-3-9. "'[R]adioactive material' includes any materials or sources, regardless of chemical or physical state, which emit radiation." N.M.S.A. 74-3-4(E).

In order to enforce this statute, the State of New Mexico has adopted several regulations regarding nuclear materials. *See* 20 NMAC 3.1, §§ 101-457. Section 101 establishes the scope of these regulations as follows:

> Except as otherwise specifically provided, these regulations apply to all persons who receive, possess, use, transfer, own, or acquire any source of radiation; provided, however, that nothing in these regulations shall apply to any person to the extent that such person is subject to regulations by the U.S. Nuclear Regulatory Commission.

10

Attention is directed to the fact that regulation by the State of source material, by-product material, and special nuclear material in quantities not sufficient to form a critical mass is subject to the provisions of the agreement between the State and the U.S. Nuclear Regulatory Commission and Part 150 of the Commission's regulations.

20 NMAC 3.1, § 101.

Subpart 4 of these regulations is entitled, "standards for Protection against Radiation." 20

NMAC 3.1, § 400. The purpose of these regulations is described as follows:

> The requirements of Subpart 4 are designed to control the receipt, possession, use, transfer, and disposal of sources of radiation by any licensee or registrant so the total dose to an individual, including doses resulting from all sources of radiation other than background radiation, does not exceed the standards for protection against radiation prescribed in Subpart 4. However, nothing in Subpart 4 shall be construed as limiting actions that may be necessary to protect health and safety in an emergency.

20 NMAC 3.1, § 400. "Subpart 4 applies to persons licensed or registered by the Department to

receive, possess, use, transfer, or dispose of sources of radiation," which includes the Defendant in

this case. 20 NMAC 3.1, §401. The regulations contained in Subpart 4 establish maximum

acceptable dose limits for individuals working with radiation and require that each licensee develop

and maintain a radiation protection program. 20 NMAC 3.1, § 404, § 405. Further, section 413

defines the acceptable dose limits for "individual members of the public" as follows:

> A. Each licensee or registrant shall conduct operations so that:

> 1. Except as provided in § 413 A 3, the total effective dose equivalent to individual members of the public from the licensed or registered operation does not exceed 0.1 rem (1 mSv) in a year, exclusive of the dose contribution from the licensee's or registrant's disposal of radioactive material into sanitary sewerage in accordance with § 435, (see note below); and

> 2. The dose in any unrestricted area from external sources does not exceed 0.002 rem (0.02 mSv) in any one hour; and

11

3. The total effective dose equivalent to individual members of the public from infrequent exposure to radiation from radiation machines does not exceed 0.5 rem (5 mSv).

20 NMAC 3.1, 413. The licensee is further required to take certain pro-active steps to insure compliance with the stated dose levels, to post signs warning of radiation hazards, to report potential exposures, and to inform individuals if they have received potentially dangerous exposure. 20 NMAC 3.1, §§ 414, 427, 428, 452, and 457. Importantly, all of these regulations, including the dose limits for members of the individual public, are exactly the same as the comparable federal regulations. *See* 20 C.F.R. §§ 20.1001 (purpose), 20.1002 (scope), 20.1101 (requiring radiation protection programs), 20.1201 (defining occupational dose limits), 20.1301 (defining dose limits for individual members of the public); 20.1302 (requiring steps to insure compliance with dose limits for members of the public); 20.1901 (caution signs); 20.1902 (posting requirements); 20.2205 (reports to individuals regarding exposure).

### 4. Summary of State and Federal Regulation of Nuclear Materials

Although numerous courts, including the Supreme Court and the Tenth Circuit, have made sweeping declarations regarding federal preemption of nuclear related issues, *see Farley*, 115 F.3d at 1503 ("with very few exceptions, state attempts to regulate in this area are preempted"), the states and the federal government have actually cooperated and shared regulatory authority over nuclear materials since 1960. Recognizing the potential interest of the individual states-- states whose involvement with the nuclear industry varies greatly-- the federal government has specifically granted states like New Mexico some authority over the regulation of nuclear materials. At the same time, the federal government has reserved for itself exclusive authority to regulate certain aspects

12

of the nuclear industry. Thus, the federal government assumes direct responsibility for licensing and monitoring nuclear power plants, defense related nuclear production facilities, and the ownership, distribution and treatment of nuclear materials present in large quantities. The Agreement States, including New Mexico, assume responsibility for licencing and monitoring individuals and facilities which possess, receive, store, transport or otherwise handle nuclear byproduct materials, source materials and special nuclear materials present in relatively small amounts. Because the Defendant in this case falls into the latter category, subject to direct regulation by the state not the federal government, the Court must bear in mind the delicate division of authority created by Congress over this subject area.

Likewise, for many decades, Congress maintained a similar split in jurisdiction between the federal and the state courts. Federal courts were granted exclusive jurisdiction over claims arising from an "extraordinary nuclear occurrence," that is, cases involving major nuclear accidents. Claims for nuclear related injuries which did not arise from such catastrophic events remained the subject of state tort law and remained within state court jurisdiction. Federal law provided indemnity in such cases and provided for "channeling" of liability to licensees, but the substantive and procedural law of each state otherwise controlled. Recently, however, Congress recognized the unique benefits of pursing all claims arising out of "nuclear incidents" in federal court under the Price Anderson Act. Accordingly, Congress again modified the relationship between state and federal courts with regard to these claims. The question pending in the current case which the Court must now turn to is exactly how that redefinition affects Plaintiffs' claims.

## B.     Plaintiffs' Claims and Preemption

Defendant asserts that the 1988 Amendments to the Price-Anderson Act completely preempt Plaintiff' state law claims, leaving a single public liability action. Defendant further asserts that the only elements of this public liability action are necessarily: (1) exposure to radiation in excess of federal limits; and (2) injury resulting from that exposure. Specifically, Defendant argues that federal regulations regarding acceptable dose limits define the standard of care in this case and the scope of the duties owed by Defendant to Plaintiffs.

Plaintiffs do not dispute that Defendant handles source material, by product material and/or special nuclear, and that Plaintiffs seek compensation for injuries for exposure to such materials, thereby falling within the provisions of the PAA. However,  Plaintiffs argue that the PAA nonetheless does not apply to their claims or, in the alternative, that the state law causes of action are only preempted to the extent that they actually conflict with federal law. Further, Plaintiffs specifically resist the application of the federal regulations as the standard of care in this case.

### 1.     Does the Price-Anderson Act Apply?

Plaintiffs argue that the PAA does not apply to his case because Defendant does not have an indemnity agreement with the federal government. Plaintiffs cite to a recent district court opinion from New Jersey which followed a convoluted path to reach the conclusion that absent an indemnity agreement none of the provisions of the PAA apply. *Gilberg v. Stephan Co.*, 24 F.Supp.2d 325, 332 (D.N.J. 1998). Specifically, the *Gilberg* court observed that an "occurrence" within the definition of "extraordinary nuclear occurrence" is defined in relation to the "location" of the licensee's activities as specified in the indemnification agreement between the licensee and the federal

government and only events originating at the defined location can be declared an ENO. From this, the *Gilberg* court concluded that none of the provisions of the Price-Anderson Act apply in the absence of an indemnity agreement defining the relevant location. Reading the Act in its entirety, attempting to harmonize all of its provisions, the *Gilberg* court held that an indemnity agreement defining the covered location was a prerequisite to application of the PAA to any nuclear related tort, including those arising out of a nuclear incident rather than an ENO, even though the statute does not define a nuclear incident in relation to any specific location. *Id.*

The Tenth Circuit recently addressed the question of whether the PAA applies in the absence on an indemnity agreement in a case which originated in this Court. *Kerr-McGee Corp. v. Farley, supra,* 115 F.3d 1498. The plaintiffs in *Farley* argued that the Price-Anderson Act did not apply as the Kerr-McGee mining operation did not have an indemnity agreement with the federal government. The plaintiffs relied on the Supreme Court case of *Silkwood,* in which the Court refused to apply the indemnity provisions of the PAA absent such an agreement. *Silkwood,* 464 U.S. at 252 n. 12; *Farley,* 115 F.3d at 1504. In rejecting this argument, the Tenth Circuit stated,

> [n]othing in *Silkwood* suggests that the absence of an indemnity agreement makes the PAA's jurisdictional provisions inapplicable. Furthermore, as quoted above, the jurisdictional provisions of the PAA, 42 U.S.C. §§ 2014(w), 2210(n), as amended by the 1988 Amendments, appear broad enough to create a federal forum *for any tort claim even remotely involving atomic energy production.* The PAA on its face provides the sole remedy for the torts alleged in this case, and we must therefore consider its jurisdictional provisions.

*Farley,* 115 F.3d at 1504 (emphasis added); *see also Boughton v. Cotter Corp.,* 65 F.3d 823, 825 (10th Cir. 1995) (applying PAA to tort claims against uranium mine without any discussion of whether company had indemnity agreement).

15

This Court will not labor long to express its disagreement with the analysis proffered by the district court in *Gilberg*.[2] As instructed by the Tenth Circuit, this Court "must apply the statute as written," *Lujan*, 69 F.3d at 1518, and the statute as written does not limit federal jurisdiction over nuclear incidents to those arising from activities covered by an indemnity agreement. *Farley*, 115 F.3d at 1504. Moreover, as even the *Gilberg* court recognized, "*Farley* now presumably states the controlling law in the Tenth Circuit." *Gilberg*, 24 F.Supp.2d at 345. Thus, following *Farley*, the Court finds that the Price-Anderson Act does apply to the present case even in the absence of an indemnity agreement between Defendant and the federal government, and the Court "must therefore consider its jurisdictional provisions." *Farley*, 115 F.3d at 1504.[3]

---

[2]The *Gilberg* court is not entirely without reason. Indeed, the "form" indemnity agreement provided in the Code of Federal Regulations defines a "nuclear incident" as "an occurrence or series of occurrences *at the location* [named in the indemnity agreement] or in the course of transportation . . . ." 10 C.F.R. § 140.92 Appen. B (emphasis added). However, this is not the definition of "nuclear incident" contained in the statute itself.

[3]Defendant argues that it is in fact an indemnified party under the PAA which defines "person indemnified" as "the person with whom an indemnity agreement is executed or who is required to maintain financial protection, *and any other person who may be liable for public liability* . . . ." 42 U.S.C. §2014(t) (emphasis added). The Court chooses not to rule on this grounds at this time because, based on the form of indemnity agreement referred to in the previous note, the Court is not certain that indemnity extends to nuclear incidents away from the location specified in the indemnity agreement, an issue not discussed by the parties. Further, because a finding of indemnity might result in the prohibition of punitive damages in this case, the Court is not prepared to conclude that Defendant is in fact indemnified absent an evidentiary foundation and further briefing. *See* 42 U.S.C. § 2010 (prohibiting punitive damages in any case where the United States government may be required to contribute through an indemnity agreement).

### 2. What is the effect of the PAA on Plaintiffs' Claims?

Having determined that the Price-Anderson Act does apply to Plaintiffs' claims, the question at the heart of this motion is what effect does the Act have on those claims. Does the PAA, as Defendant contends, completely preempt Plaintiffs' state law causes of action leaving a single public liability action, with the two elements identified by Defendant? And do the regulations defining acceptable dose limits constitute the standard of care in this case?

### a. The Scope of Preemption

The Price-Anderson Act as amended provides that the federal district courts shall have original jurisdiction "[w]ith respect to any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). The Act further provides that a public liability action "shall be deemed to be an action arising under section 2210 of this title, *and the substantive rules for decision in such [an] action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.*" 42 U.S.C. § 2014(hh) (emphasis added). The question presented by this unique drafting is what is the combined effect of declaring that all actions for liability arising from nuclear incidents "shall be deemed public liability actions" arising under federal law but that the "substantive rules for decision" in such cases shall be derived from state law?

All of the courts to have addressed this issue agree: Price-Anderson completely preempts a plaintiff's state law claims regarding exposure to the identified nuclear materials, recasting those claims as a public liability action under the PAA. However, state law provides the substantive rules of decision for the public liability action, to the extent that state law is not inconsistent with federal

17

law in the area of nuclear regulation. Accordingly, the state common law tort causes of action named in the complaint form the elements of the plaintiff's public liability action, to the extent that the state law is not inconsistent with federal law. *Roberts v. Florida Power & Light Co.*, 146 F.3d 1305, 1306 (11th Cir. 1998); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1096 (7th Cir.), *cert. denied*, 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1549 (6th Cir. 1997); *In re TMI Litigation Cases (TMI III)*, 67 F.3d 1103, 1106 (3rd Cir. 1995) ("Pennsylvania tort law would control here, unless inconsistent with federal law.); *Day v. NLO, Inc.*, 3 F.3d 153, 154 (6th Cir. 1993) ("The amendment was not intended to alter the state law nature of the underlying tort claims."); *In re TMI Litigation Cases (TMI II)*, 940 F.2d 832, 853 (3rd Cir. 1991) *cert. denied, sub nom. Gumby v. General Public Utilities Corp.*, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992); *McCafferty v. Centerior Service Co.*, 983 F.Supp. 715, 717-19 (N.D. Ohio 1997); *McLandrich v. Southern California Edison Co.*, 942 F.Supp. 457, 459 (S.D.Ca. 1996); *Smith v. General Electric Co.*, 938 F.Supp. 70, 75 (D.Mass. 1996); *Corcoran v. New York Power Authority*, 935 F.Supp. 376, 385-86 (S.D.N.Y 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996) ("state law substantive rules of decision apply, and only those theories of relief that are inconsistent with federal law need be dismissed."); *Coley v. Commonwealth Edison Co.*, 768 F.Supp. 625 (N.D.Ill.1991); *In re Hanford Nuclear Reservation Litigation*, 780 F.Supp. 1551, 1570 (E.D.Wash.1991); *James v. Southern California Edison Co.*, No. 94-1085-J (S.D.Cal. filed Dec. 13, 1994); *see also Boughton v. Cotter Corp.*, 65 F.3d at 832 (applying without discussion Colorado tort law to injury claims pursued under PAA); *Building and Construction Dep't v. Rockwell International Corp.*, 756 F.Supp. 492, 493 (D.Colo.1991) (summarily noting in factual background that Colorado law applied under PAA), *aff'd*, 7 F.3d 1487, 1490 and n. 3 (10th Cir.1993)

(referencing district court's "[a]pplying Colorado substantive law as directed by the Price-Anderson Act"); *Caputo v. Boston Edison Co.*, 924 F.2d 11, 13 (1st Cir. 1991) (applying without discussion state tort law to claim of personal injury under PAA); *Landry v. Florida Power & Light Corp.*, 799 F.Supp. 94, 96 (S.D.Fla.1992) (summarily noting in factual background that Florida law applied under PAA), *aff'd without op.*, 998 F.2d 1021 (11th Cir.1993); *Brown v. Centerior Energy Corp.*, No. 1:91CV0332, 1992 WL 694453, at *5, 1992 U.S. District LEXIS 21325, at *14 (N.D.Ohio 1992) (summarily noting in factual background that Ohio law applied under PAA).

Thus, in *Lujan v. Regents of the University of California, supra*, 69 F.3d 1511, for example, the district court held that all plaintiffs' state law claims regarding exposure to radiation were preempted by the PAA and "have meaning only as 'elements' of the federal Price-Anderson Act claim and, even then, only if they are not inconsistent with [the act]". *Id.* at 1514. The plaintiff did not appeal this determination.

Further, in *Lujan*, the Tenth Circuit analyzed at length whether the New Mexico state statute of limitations for wrongful death applied to claims under the PAA. 69 F.3d at 1516-1519. Concluding that the statute of limitations was not merely procedural but substantive, because it "limits or conditions the right of relief itself," the *Lujan* court held that the New Mexico statute did govern plaintiffs' claims under the Price-Anderson Act. *Id.* at 1519. In reaching this conclusion, the court observed, "[o]ur task . . . is to effectuate the terms of the statute as written, not to give effect to some broad, amorphous federal policy." *Id.* at 1518. "Here, the statutory language is clear. Congress specified that state law should provide the substantive rules for decision in public liability actions unless it is 'inconsistent with the provisions of' section 2210." *Id.* (quoting 42 U.S.C. § 2014(hh)).

19

Consequently, under the express terms of the statute, although Plaintiffs' state law causes of action are technically preempted, "only those theories of relief that are inconsistent with the provisions of Section 2210 [of the PAA] need be dismissed." *Corcoran*, 935 F.Supp. at 385-86; *Bohrmann*, 926 F.Supp. at 218. Further, general principles of preemption dictate that "[i]n the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). State law may be preempted by federal regulation as well as by federal statute. *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (1985). Thus, any state law elements of Plaintiffs' claims which actually conflict with federal regulation of nuclear materials or which interfere with such regulation are also preempted. *See McKay v. United States*, 703 F.2d 464, 468 (10th Cir. 1983) (analyzing federal preemption of state tort actions which actually conflict with federal regulation of nuclear energy prior to 1988 PAA Amendments).

In the present case, Plaintiffs allege 14 common law torts, all asserting negligent or intentional acts. With the exception of the standard of care, discussed below, the parties have not addressed whether any of these torts or the specific elements of any of these torts actually conflict with federal law. In general, other courts have concluded that causes of action asserting negligent or intentional acts do not conflict with federal regulation of nuclear materials, except with regard to the standard of care. *See McCafferty*, 983 F.Supp. at 717-19; *McLandrich*, 942 F.Supp. at 465 (noting that courts have refused to preempt intentional tort and fraud claims); *Corcoran*, 935 F.Supp. 386-87 (allowing negligence based claims including failure to warn and misrepresentation based on

federally defined standard of care and intentional torts if plead as an intentional violation of regulations); *Bohrmann*, 926 F.Supp. at 221 (allowing tort claims for negligence, assault and fraud though not for strict liability). Specifically, courts have recognized the viability of public liability actions premised on allegations of failure to warn, fraud, and negligent or intentional misrepresentation, as well as actions for assault, negligence, and negligence per se. *See McCafferty*, 983 F.Supp. at 717-19; *McLandrich*, 942 F.Supp. at 459; *Corcoran*, 935 F.Supp. at 385-86; *Bohrmann*, 926 F.Supp. at 221.

Following these cases, with the exception of the standard of care discussed below, the Court finds that none of the elements of the causes of action alleged here in fact conflict with federal regulation of nuclear materials or § 2210 of the PAA. Therefore, none of Plaintiffs' state law causes of action need to be dismissed from the Complaint.

### b.    The Standard of Care

Finally, Defendant asserts that the standard of care to be applied to all of Plaintiffs' claims is preempted by federal law. Specifically, Defendant argues that the federal regulation defining acceptable dose limits for the general public controls here. Plaintiffs present little argument on this point, asserting merely that the standard of care is not preempted.

Every other court to consider this question has concluded that the federal regulations defining acceptable dose limits do preempt the standard of care in a public liability action, regardless of what state torts are pled in the complaint. *See TMI III*, 67 F.3d at 1113-15; *O'Connor*, 13 F.3d at 1105; *TMI II*, 940 F.2d at 858-59; *McCafferty*, 983 F.Supp. at 717-19; *McLandrich*, 942 F.Supp. at 465; *Smith*, 938 F.Supp. at 76; *Corcoran*, 935 F.Supp. at 386-87; *Lamb v. Martin Marietta Energy*

*Systems, Inc.*, 835 F.Supp. 959, 965 (W.D. Ky. 1993). However, everyone of these cases has dealt with tort claims arising from the operation of a nuclear power plant. Such plants are subject to direct regulation by the federal government under the Atomic Energy Act.

In contrast, Defendant in the present case is subject to the licensing requirements and regulations of the State of New Mexico, not the federal government. As described above, Congress has specifically delegated to the states the authority to regulate businesses, such as Interstate Nuclear, which handle nuclear materials in relatively small amounts. The regulations imposed included not only the dose limits discussed by Defendant but also the extensive regulations discussed above regarding warnings and notification to individuals if exposed, and prophylactic measures to prevent excessive exposures.

Because the PAA provides that the substantive law of the state controls a public liability action, and because Congress has delegated regulation of entities such as Defendant to the states, the Court finds that the applicable standard of care in this case is defined by the state regulations, including but not limited to the regulation defining dose limits for members of the public, to the extent that these regulations do not in fact conflict with federal regulation of nuclear materials. As noted, the New Mexico regulations concerning nuclear materials are, as far as the Court is aware, exactly the same as those imposed by the federal government on entities under its direct regulation. Accordingly, the Court finds that the standard of care is not preempted by federal law but defined by the entire body of New Mexico state regulations applicable to Defendants. The Court will however revisit this issue if necessary should the parties discover a relevant state regulation which has escaped the Court's attention and which appears to actually conflict with federal regulation of nuclear materials.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss **[Doc. 5]** is hereby

**GRANTED IN PART**. The Court finds that Plaintiffs' state law claims are preempted and must be

deemed a public liability action arising under the Price-Anderson Act. However, the state law causes

of action pled in the Complaint constitute the elements of Plaintiffs' public liability action and need

not be dismissed from the Complaint. Further, New Mexico law governing the nuclear materials at

issue defines the relevant standard of care for this case, to the extent that such regulations do not

actually conflict with federal regulation of nuclear materials. Plaintiffs are granted leave to file an

amended complaint should Plaintiffs deem it necessary to clarify their allegations given the present

ruling of the Court.

_____
MARTHA VÁZQUEZ
DISTRICT COURT JUDGE

Attorney for Plaintiffs:
    Linda Hemphill
    Bryan Coluccio

Attorney for Defendant:
    David Reynolds
    Donald Jose